Our next case that we will call is Weems v. City of Centralia, 5-17-0195. This is Eric Terlizzi and Mr. Wong. My name is Eric Terlizzi and I represent the plaintiff appellant in this case, the estate of Opal Reeds. This case, as the court is aware, concerns the status of title to land in Raccoon Township in Marion County adjacent to Lake Centralia, which has been water supply for the City of Centralia since 1910, basically when the lake was built. This complaint was originally filed in 10 counts. Counts 1-9 were about some individual landowners that owned small lots on the east and south side of Lake Centralia. Count 10 named the City of Centralia as a defendant and essentially that included all landowners of all this land in this quarter section that was relevant here. The parties all agreed to tender this case to the court. First of all, there was a very extensive stipulation of fact. All counsel was cooperative enough to agree to that and the abstract and the various deeds that were in question were attached. There was no dispute about those. The counsel also agreed that it should be submitted to the court on a bifurcated basis. That is, the court first was submitted the question of determining what the real effect was of the various deeds in the chain of titles. These deeds go all the way back to 1843. In fact, the last really relevant deeds to the questions presented to the court go back to 1910. Obviously, we did not have grantors or grantees that come into court and testify that all this was intended or that was intended or attorneys that drafted the deeds. If the court had found in favor of the estate on that, then that would have raised counterclaims and affirmative defenses of adverse possession that were pled by the individual landowners. Three of those individual landowners, their cases were resolved before trial. So the only two actual, at this first part of the bifurcated trial, the only two actual witnesses were the two surveyors. One surveyor that had been retained by the estate, Mr. Phillips from Roundtable right here in Mount Vernon, and the other was actually the grandson. He was a registered surveyor, but the grandson of Marvin Jenkins, a surveyor in Salem who had done a survey on behalf of the city. And essentially what the surveyors explained to the court was the rules of surveying, how they go about doing it, how they interpret a deed, and then explained, tried to make sense out of these deeds. And I'll be the first to admit, and I think everybody who's touched this case would admit, these deeds were a mess. Some of these descriptions are as long as you're on, they're convoluted, the acreages don't match the meets and bounds, the meets and bounds sometimes don't match the descriptions to monuments. So it was a jigsaw puzzle without a picture to work from. Both surveyors testified very honestly and competently as to what they thought, and I probably should have made a blowup of this, Your Honors, but at the appendix, page 94, is the survey that the city surveyor Jenkins did and his grandson Mulvaney testified to. And essentially the real dispute was the fill-ups, the estate attorney, believed that considering all the deeds, the estate retained property north and west of this straight diagonal line, other than the property, nobody disputed, the Antioch Cemetery owned this small area here, and nobody disputed that the city owned under the actual lake. The Jenkins survey, by attempting really to reconcile the acreages in all these various deeds that were clearly messed up, concluded that the appropriate line would be what in the trial and in the abyss referred to as the Hoosier Branch, because that's this creek named Hoosier Creek, and the line kind of follows that creek, not with the meanderings of it, but a straight line, diagonal line up to the lake and then down the lake. The problem, the real salient problem in this case is really not as much with what the trial court decided, but even more so with what the court failed to decide here. Everybody who had an interest in this land was before the court. Somebody has to own all this land. What the court found was it found that the Jenkins survey was more probably than not a correct interpretation of various deeds, but the court did not go on to make any opinion or enter any ruling as to in fact what that finding meant. I take it, although I really don't know how, but I take it that the city from its briefs is somehow indicating that that means that they own all land other than the 8.4 acre triangle, which they assert was all that was retained by the estate's predecessors when they made these various deeds. And the deeds that were granted that are in question here were grants and then with reservations, with exceptions, and that's part of what created the problem here. All of this except for retaining this. And that's where all the mismatch in the acreages and everything else came up. But what is absolutely essential in this case is that all the deeds, there weren't deeds to the city. It was a private company, which is essentially a water supply company, but it was the predecessor to the city's title, to any claim the title of the city has in this entire corner section. Those deeds in 1910 to the Centralia Water Supply Company, again went on for these great big long descriptions and then the exception, but they all conclude, they all have in there the express language that intending thereby to convey that part of the so-and-so to the high water mark of the lake. Now, the city's own surveyor, Mr. Mulvaney, got on the stand and he said, that is the best evidence of the intent of the parties, an express statement of intention. He also expressly testified, as did Mr. Phillips, so the only testimony in front of this court was that there is not one shred of, there is no document, there is no testimony, there is no evidence, anything to indicate that the city acquired title to anything that's not under water, anything that's not to the high water mark of the lake in flood time. Am I correct in my reflection from reading the file that at the time of that grant in 1910, the lake had not been formed? That's exactly right. So we don't know what a high level mark was. It was engineered to be at a certain level, but no one truly knew. Can they include language about granting easements for horses and trailers and things to get in there? I guess that's how, you know, before machinery, that's how they got in there. Yes, those deeds were made so they could construct this lake, which they did. Now, I don't know if the city contends that there's a dispute. I mean, we've had 118 years now or 117 years since that lake was built. That's a pretty good time to establish what the high water mark in flood time is. So if that's an evidentiary dispute, so be it. Remand back to the trial court and let's have an evidentiary hearing on exactly where that takes us. I mean, it obviously is not going to matter more than a few feet. I mean, I don't know that we've ever had a flood that extended what is normally a normal pool too extensively. But we're happy to do that if that's – but there has to be a determination. The city is just wrong when it says in its brief that this decision does not leave us with no man's land. The court has – the court did not, in fact, decide – it did not say that the city owns anything beyond the high water mark of the lake. It just said, you know, we accept the Jenkins survey, but it didn't find a title to the estate in that portion that the Jenkins survey – I think by implication it really did find what we're saying. Now, we argued, of course, that it was that straight diagonal line, and we still think that's correct. But at least there's evidence in the record to support that the court could find the Jenkins survey to have been correct. But even if you assume you do, I mean, somebody has to own that. And we think the north and west of those lines, the Hoosier branch line we refer to it as, and it just cannot – it's certainly not an individual landowner. The court specifically found that they only own what their meets and bounds on their lots were, and that's beyond dispute. They're not even a part of this appeal. But it certainly cannot be the city. You know, there's several pages in our brief about the rules of construction on a deed. But keep in mind, the rules of construction, of course, are only there to try and be guidance to what the real job is. And the real job is, what was the intent of the parties? Now, if I had gone back and drafted these deeds myself to try and make a good case for us, could you have had any better language in a deed that says, it being the intent of the parties, that the city gets to the high-water mark of this lake that's to be built? Now, you know, there obviously could have been some real confusion and maybe a lawsuit before it was built, what was intended there, because, boy, is that vague and ambiguous. The high-water mark of a lake that doesn't even exist. What I don't understand is, how could a lake be higher than the spillway? I mean, what is flood? What kind of flood are we talking about? I don't think that's a real issue. I mean, I don't, I think the city kind of raises it. Maybe, you know, maybe back in 93, when we had those horrible floods, it was up, you know, a little bit. But that lake's been there 117 years. So they didn't argue that. They didn't argue, well, the water has gotten this high and that's why we're claiming ownership up to here. No, because if I read it correctly, all of them said the normal high-water mark, absent extreme droughts or floods. I don't know if anyone got that specific, Your Honor, but they certainly said, all of the, both surveyors clearly said that in their opinion, it's too reasonable to be a survey uncertainty. The city owned nothing beyond the high-water mark, whatever that was. I really think the issue has been more raised on the appellate level in their brief than it was at trial. And I don't think it's a bona fide question. I think it obviously could be easily established. And I think Your Honor is precisely correct. I mean, a lake that's been there 117 years, we know where the shore is. We know what the high pool is. And that can be easily established. But this title has been messed up since 1843, if my math is correct. That's what, 175 years. It's time to get it straight. I mean, somebody has to own this. This area is not even on a tax roll at this point because this title has been so messed up for so long. We've got everybody who has a conceivable interest in front of the court, with jurisdiction, seeking a private title. And I think that's all we need to do. And it's not to overly criticize the court. This was the trial court. This was a – if somebody didn't have much experience in terms of legal descriptions and so on, it would have been a nightmare, believe me, with these descriptions, as you can tell. But we cut up through all that. The basic point is even if you accept the Jenkins survey, the city survey, I think that has to mean that the estate, as the predecessor in title to the original grantors of the successor in title to the original grantors of all this, has to own all that property north and west of that line other than what's under the lake and the cemetery. And so we think what the appropriate remedy here is this court to affirm in part and then reverse as to the – really, I don't know if the court really even reverses, but to remand for a final appeal to order that settles the title. I don't see how the trial court on this record could find that the city owns anything behind the high water mark. And I think it would certainly be appropriate for this court to remand with instructions for the trial court to so find, because everybody agreed to that. And then to – if we need an evidentiary hearing on exactly where that line is, the high water mark, so be it, we'll get the surveyors back in the court and they can each say their spiel, and the trial court can say this is where the high water mark is. But we need definition. We need finality after 175 years of who owns what in this court of sections land adjacent to the lake. Would you be able to bring your exhibit up and point out a few – and if you'd like to come up, Counselor? Yes. I've got a large poster. The reason I didn't bring it in here is I just like the revised version of that. I can bring that in if you want to see that. Well, let me just take a look at this right now, if I can read it. My copy that I had, I couldn't – I couldn't move that. It's the same. So show me what is the disputed – what is – that your client is claiming ownership of. Our client claims based on the films, the brown people survey, the title, everything north and west. Gotcha. Except for the cemetery and under the lake. Under the lake. What did the court award? The court did. That's the problem. Okay. The court simply says it accepts the Jenkins survey, which found this to be what – the court said its interpretation of the Jenkins survey was – the Jenkins survey was – which would put that – but the – because he's also talking about it between the 8.4 acres, which is only this little triangle up here. So based on the court's ruling, what does – what do Mr. Weems own currently? I don't know. That's what I was afraid you were going to do. And the court doesn't say it. That's the problem. Gotcha. Okay. Are you finished? I am. Okay. Thank you. You'll have five minutes. Roberto. So, Your Honor, may it please the court today. There are – as I see it, there are three problems for the plaintiff in this case that lead to some, I think, inescapable conclusions. The first is that when this deed was executed on August 22, 1910, there was no reservoir. The reservoir did not extend on to the Hayducks' land. The Hayducks were the people who owned it. Consequently, the reservoir had never flooded on the Hayducks' land. Therefore, there was no visible permanent high-water mark on the Hayducks' land. Now, in their brief, the plaintiffs talk a lot about why this should be a natural monument. It cannot possibly – and when I say a natural monument, I'm talking about the high-water mark line. It can't possibly be a natural monument because it didn't exist. And I would say that probably the first prerequisite for a natural monument, if you're going to use it in a surveying legal description, is that it actually exists. It didn't exist. And it doesn't make any difference that it existed for 110 years after the deed was done. On the day the deed was done, if you looked at that land, you could see crops. You could see fence rows because there's a reference to that in the deeds. You could see maybe timber. It doesn't say that. But there was no actual physical high-water mark line. What there is in the deed, though, which the plaintiffs have not come to grips with, was this language. And this is on page C349, number 58 in the abstract. This is from lines 5 to 8. It says, to the high – this is part of the Hayducks' deed. That deed conveyed land in different quarter-to-quarter sections. This is the beginning. It says, to the high-water mark in flood time of the reservoir of the Centralia Water Supply Company as now surveyed and staked out over said tract. So obviously what they had in view, what they had in mind when they referred to the high-water mark in the deed, was the surveyed and staked out line. Because that claim was there. That's something that you could use on August 22, 1910, when the deed was done. Now, another problem for the plaintiffs besides the fact that an actual physical high-water mark line did not exist and the fact that they've not come to grips with the existence then of a surveyed and staked out high-water mark line was that they never introduced any evidence of the location of any high-water mark, either the surveyed and staked out line or the actual physical high-water mark line that they say has been there for 110 years. And since they didn't introduce any evidence, for all we know from looking at this record, the high-water mark line surveyed and staked out might coincide exactly with the southeast side of the primary portion that needs to be retained. And the reason I think that that's the case is if you look at the deed, well, actually, if you look at the deed and also look at Kevin Phelps' testimony at the trial of the case, the beginning point. Mr. Phelps was the surveyor for the claims. Kevin Phelps, yes, the surveyor for the claims. Right. The beginning point and the ending point of the legal description of the accepted area was on the surveyed and staked high-water mark line. Kevin Phelps points that out. So that's only one point, but it suggests to me that perhaps that entire side, the southeasterly side of that primary portion, was entirely on the surveyed and staked out high-water mark line. Now, since the record doesn't eliminate that possibility, doesn't even really address it, it's impossible to say that there's any ambiguity at all in the legal description. There are numerous cases in Illinois. I don't know if I can remember all of them on the site. Urbias v. Commonwealth Edison, Sheldon v. Andres, Department of Transportation v. Western National Bank of Cicero. I made a mistake. Congress of Cicero. All those cases say that you look to the deed, you look to the four corners of the deed, and you must first decide whether there was any ambiguity. If there's no ambiguity, you don't go outside the deed at all. You just interpret the language of the deed as it is written. And if you look at this deed as it's written, it really is, it's really, to me it's clear. I mean, it may not be the most, the best example of legal drafting, but it is clear because it starts out by saying that the Hayducks convey all that they owned in the northwest quarter of the northwest quarter of Section 9, 16 acres, except, and then they describe with a description that closes the accepted area. It starts at this point, this 300 feet west of the corner of the northeast corner of the northwest quarter of the northwest quarter. That's confusing. We have to start talking about quarter quarter sections, but it starts there and it makes the complete circuit, the end circuit. So I really don't see whether there's any ambiguity. And what they are attempting to do here is to say that this intention clause at the end somehow explodes everything that precedes it and overturns it. And they do that by assuming that refers to the actual physical high watermark line, the location of which they never bothered to prove. So when you look at the deed itself, just the language of the deed, there is no ambiguity. There's no reason to go looking for what natural monuments might say, what they might suggest. And really, there's just no question that I can see here at all. How many acres of land are you talking about? Well, they paid us and they 7.6 to the Centralia Water Supply Company. They reserved 8.4. So that's the 16 acres. You know, if you look at the deed, there are a lot of indications that they thought through this, that they said exactly what they meant. So the city is claiming the land. Well, here's the situation. I wasn't in the trial, so I hope I'm not misstating this at all. But the plaintiffs began this action, acquired title action. The city just answered in. And to my knowledge, we didn't file a counterclaim at all. In other words, this was the plaintiffs trying to establish that they owned all this land. In count 10, they were against the city of Centralia. But what the court said was, your count 10 is denied. You don't. In other words, they were trying to go beyond the accepted area. But they were going underwater. Excuse me? They were not going underwater. I'm trying to sell that. Just what was it? Above water. I'm not sure I want to tell you. They weren't trying to sell any land below the flood line. Just land above the flood line. Is that correct? Well, what the deed says is. . . The deed says, what are they trying to do? That's what I want to know. Who's trying to do what? The point I'm making, Judge, is the intention clause, it does say language about. . . It does refer to a high-water mark line. But the point I'm trying to make is that that had to be a survey and state high-water mark line. Because the actual physical line didn't exist yet. So the survey and state high-water mark line might indeed be, and I think it was, the southeast side of that triangle. Because that's a significance of the fact that the beginning point was stated by the deed itself. So the plaintiffs are trying to sell something that the city says you don't own. Is that what's happening? No. You're talking about in this case already. No, I'm talking about this case right now. No, the plaintiffs are trying to establish that they don't own beyond this triangle. I'm just talking in terms of water line and no water line. In other words, the plaintiffs are trying to sell some property that is above the high-water mark line, and your argument is it's meats and bones. Well, I'm not trying to be difficult. I'm just not sure I'm answering this question right. No, I don't think you are. What they're saying is that I don't know that they're trying to sell anything. What they are trying to do is to say that we own part of the... We being the city. No, the plaintiffs are the we. Oh, okay, the plaintiffs. We're the plaintiffs. So the plaintiffs are trying to say you may have thought you've owned this over the last hundred years, but we actually own it based on what this deed says. Can I have a glass of water here? Sure, go ahead. There's a... No, yeah, right there. I need to come over here more often. I haven't been for about five or six years. I've always changed that much. Yeah. Excuse me. So while you're having a drink, let me ask you to clarify what I'm having trouble with and I think what Justice Welch is having trouble with. So there was originally 16 acres. They at some point provided, they said the city basically is going to have 7 point something of that and that the Weems are going to keep 8, at least in contention, that the Weems would keep 7 and the city would keep 8 or vice versa. That triangular part that was reserved in that deed from 1910, that's 8 acres? Well, the deed says that it's 8.4. Right, and there's no question that the Weems own that currently. No, there's no question at all. So all they're claiming is they own a portion of that remaining 7 acres that the city claims to own. That's true. In fact, what they say is if the city didn't get 7.4, they actually only got 3.61. Gotcha. So that's what they're saying. But the problem is, perhaps I'm repeating myself here, but they've not succeeded in creating any ambiguity at all that would require you to consider any of these things. I understand. Mainly because they didn't introduce any evidence of where the high watermark line is located. And really, that's what this trial was for, to determine where their ownership was. And if they were ever going to introduce evidence of the location of the high watermark line, that was the time. In fact, the judge that presided, I forget the judge's name, specifically asked their surveyor after he gave a detail and an accurate description of how to determine where the high watermark line is. He said, the judge asked, was this done? In other words, did you determine where the high watermark line was? He said no. So there's absolutely no evidence in the record of exactly where the actual physical high watermark line is. There's also no evidence in the record except for one point, and that's that point I told you about, the beginning point of the accepted area. There's no evidence of the record of where the staked and surveyed high watermark line was. But we do know that the beginning point and the ending point of the accepted area was on that staked and surveyed high watermark line. So that being the case, I suggest that the entire southeastern side of that triangular area was on the staked and surveyed high watermark line. There's nothing in the record, no evidence at all, that would contradict that. So that's really the essence of our case. I do want to read two statements from their reply, but really it already confirms what Mr. Chorlizzi has already said. He admits in here, as he did in the old argument, the reservoir was built after the deed was given. I really don't know how in the world you could write a legal description that has some kind of floating boundary. I don't mean literally and figuratively here. I just don't know how you could say, well, we'll determine 10 years from now how much you've given us and how much we've gotten. That's not what they did at all. They calculated it precisely. They calculated the acreage. The price was $65 per acre. The deed even recites that they paid that price. So it's obvious from this that the party's intentions, particularly the intention of the Grand Tours, the HATOs, was to convey everything that they own, except what they specifically reserve in that accepted area. Which, I mean, there's no doubt what that accepted area is, because it's defined in a meets and bounds description. It starts and ends at the same place, so it flows properly. So I really don't see what the, whether there could be any possibility of an ambiguity. And this idea that somehow there's a no man's land here that has to be addressed, I think that's not a real issue in this case. The issue was on count 10 brought by the Wings, do they own anything more than the 8.4 acres? The judge said, no, you don't. That's it. So now they're complaining that the judge didn't say, well, who owns this land over here beyond the area you say that we own? I mean, who cares? It's not theirs. That's the answer. And if the city and the other people around there feel the need to litigate that, they will. But for this case, all that the court needed to do was to rule on the Wings' count 10. The court did. He denied it. So you're basically, your whole argument is that the 1910 deed was very clear in your opinion. It is clear. And that the Hot Ups owned a certain 16 acres. Yes. They reserved 8 acres approximately. 8.4, that's right. 8.4 acres. And that everything else that was not specifically reserved was to be given to the city. That's true. Assured to the city. And they're trying to over- It doesn't matter where the high water mark is. That's true. It was based on that 8.4. Other than that and the cemetery, there's nothing- That's true. That they have an ownership right to. They get to the point of trying to explode everything above the intention clause by saying, well, that's a reference to a national monument. That takes precedence over everything else. I noticed Mr. Scherlizzi didn't mention once that there's a national monument involved, and I think that's because we've pointed out it can't possibly have been a national monument because it didn't exist. So that argument really doesn't get them anywhere. And this court said itself in Jones v. Johnson, 1974 decision, you can't look at just the intention clause itself. You have to look at the whole deed. You have to consider every word like the Illinois Supreme Court said, Nervides v. Common, North Edison. And when you consider every word, you can see that this intention clause merely described what the grantors thought that they had done. The grantors weren't trying to suddenly change everything that they had done before. In fact, there are a couple of cases that established presumptions that would apply here. Basically, what the Winters are trying to do is to set up a second description in this deed that somehow overrules everything that went before. There's a decision, Forest Preserve District of Cook County v. Lehman States. It says when you have a situation where there's two different descriptions, you take the description that favors the grantee. The grantee was Centralia Water Supply, the city of Centralia's predecessor and interest. The other case is Barker v. Walker, an Illinois Supreme Court decision from 1949, that says if you have two contrasting conflicting legal descriptions, you take the one that comes first and discard the one that comes second. The one that comes first here is the one we've talked about at some length here in this portion of our oral argument. The grant of all the 16 acres except the 8.4 acres that they accepted out. So that's their case. How many acres did the HODUCs get paid for by the city of Centralia? They got paid for 7.6. Exactly what the deed is, $65 an acre. In fact, I worked through the calculations somewhere in the brief there, Judge. But they got paid exactly... The HODUCs out there were selling 7.6. Centralia Water Supply thought it was buying 7.6 and it paid for 7.6. They didn't think that they would get the 3.61. So the 7.6 that the city paid for, the HODUCs retained and accepted out the 8.4. 8.4. And they've owned that ever since. There's no other additional acreage besides that 8.4 and that 7.6. There's no additional acreage that's in Countess Mount, correct? I don't see how it is because that was the issue here in Count 10. There were other things involved with other people that the Wienzes had joined and they settled with all of them. But that's the issue here. Whether the Wienzes owned anything other than the 8.4 acre triangular piece that was described in that deed. And the judge's answer to that was, no, you don't. So that seems to me to be a pretty complete answer to the question of what the Wienzes owned. And I'll ask Mr. Trelizzi this when he comes back up, if he chooses to do so, where can there be no man's land that has been referred to if all the land is accounted for? I don't understand that either. The no man's land being suggested is whatever the high water mark is up to that 8.4. I guess that's what they're driving at, that somehow we can't own beyond the high water mark. Therefore, if the Wienzes don't own it, some other person must own it. But our argument is that they're misunderstanding what the reference to the high water mark line, that was the reference to the surveyed and staked line. And the city, well, the Centralia Water Supply Company, now the city, has owned everything in that northwest quarter, the northwest quarter section 9, other than the 8.4 that they've reserved since 1910. Thank you. Thank you, Your Honor. Mr. Trelizzi. Just so there's absolutely no misunderstanding, paragraph 4 of the stipulation of facts said, notwithstanding anything here to the contrary, plaintiffs in no event make any claim to title to any portion of the lake Centralia below the high water mark. That's crystal clear. Also, the stipulation of facts said that on the bifurcated basis, what we were submitting to the court was the court first determined as a matter of law what was intended to be and, in fact, conveyed to the various parties and the legal effect of the documents and conveyances conferred in the exhibits hereto stipulated to. So there was no occasion in the first bifurcated part to have an evidentiary trial as to where the high water mark was. We were submitting it to the court with the testimony of the surveyors to determine what was the legal effect of the documents alone, the documents themselves. But there is, in fact, evidence in front of this court as to where the lake is, what it is. There's the surveys that depict where the lake is. There's the aerial photographs that the surveyors platted over that picture where the lake is. So the court, there's no question of where the lake is. And counsel refers to rules of construction and so on, says that 1910d is not ambiguous. Well, all you have to do is read the report, two-page report of Marvin Jenkins, the city surveyors, with all the notes and then read the testimony of his grandson, Surveyor Mulvaney, how he tried to put this whole puzzle together and figure this all out. These are not clear and unambiguous deeds. And finally, let's not forget the central point of any litigation concerning boundary lines and titles is that all the cases say that the central point is what is trying to ascertain the intent of the parties. And we don't get into rules of construction. We don't have to if we know what the intent of the parties is. And what could be more crystal clear to determine what the intent of the parties is than an express expression on the face of a deed that says it's the intent of the parties. We're selling you land for a lake and that is only going to go to where the lake is under the water and nothing else. And that's essentially what these deeds say. Counsel, what about this argument that, well, the city or its predecessor paid for 7.6 acres? Well, I mean, I don't necessarily accept that either, Your Honor. There's a consideration paid. We don't have any of those parties here. We don't know what per acre was paid. We know what amount was paid. But even if you would accept that argument, that again is going more to like a secondary element of trying to figure out what was intended here. Well, did they pay per acre and how many acres? When you have, you know, the document itself that says this is what was intended. Now, all these deeds, even in the prior treaty and the title, are so ambiguous and none of these acreages add up. So moreover, if you do go to rules of construction, as you can see in our brief, according to the legal rules and the surveying rules, acreage is the last thing you go to. If there's anything that conflicts with acreage prior to that, a meeting bounds, a monument, anything else, acreage is disregarded because, of course, you know, we're dealing in 1843 and 1910 before we had GPS, before we had, you know, not surprising, I guess, that there were some substantial mistakes in these acreage calculations and so on. So those are just, I mean, they're estimates and they're the absolute last thing you go to to try and resolve an ambiguity. But when you have the clearest possible expression of intent of the parties, the city was buying land for a lake. The city built a lake. It's been there for 108 years now. The city had never, there's not one shred of evidence or document to purport that the city has ever claimed title to anything other than the water to deliver to its citizens as a potable water supply. So the suggestion now that the city owns that is, I think, completely contrary to, I mean, if they want to file a counterclaim for adverse possession saying they've exercised control or something, I guess they could on remand or on a separate lawsuit. But for what the court was called on to decide, what was the effect and what was the intent of these deeds, we cannot, as I said, have any clearer evidence of the intent of parties than both parties expressing in the deed, this is our intent. So you're suggesting, though, that what Mr. Long brought up in terms of the price paid for what the city paid to the HUDDUPS is not in any, it's not laid out as to the number of acres or the price per acre. It's just a flat sum that was paid for what they believed to be up to the high water line. Your Honor, that's my recollection. I don't want to state that with absolute authority because I don't want to misspeak to the court, but I thought that was the case. But in any event, it would be a second or third or tertiary thing to go to to determine intent. Thank you. All right. Thank you. We'll take this under advisement and issue a ruling in due course. The court's going to stand at recess for five minutes. Five minutes. All rise.